IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 22, 2005

## STATE OF TENNESSEE v. MICHELLE TIPTON

**Appeal from the Circuit Court for Sevier County**
**No. 8733      Richard R. Vance, Judge**

_____

**No. E2004-01278-CCA-R3-CD - Filed August 22, 2005**

_____

The Appellant, Michelle Tipton, was convicted by a Sevier County jury of the first degree felony murder and second degree murder of Pamela Hale.  The trial court merged the second degree murder conviction with her first degree felony murder conviction, resulting in a sentence of life imprisonment.  On appeal, Tipton raises the following issues for our review: (1) whether the evidence was sufficient to support the verdicts; (2) whether the District Attorney General's office should have been disqualified from prosecuting the case based upon Appellant's co-counsel's subsequent employment with the State; (3) whether the testimony of two witnesses should have been excluded due to disclosure violations; (4) whether the trial court abused its discretion in admitting into evidence certain photographs of the deceased and a portion of the deceased's skull; (5) whether the State's closing argument was proper; (6) whether the trial court erred in admitting her co-defendant's statement; and (7) whether the trial court should have instructed the jury with regard to parole eligibility.  After a review of the record, we reverse Tipton's conviction for second degree murder based on the trial court's failure to instruct the jury concerning the natural and probable consequences rule.  However, a review of the issues raised on appeal reveals no error.  Accordingly, Tipton's conviction and sentence for first degree felony murder are affirmed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part and Reversed in Part**

DAVID G. HAYES, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Dennis Campbell, Sevierville, Tennessee, for the Appellant, Michelle Tipton.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General; and Steve Hawkins, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## Factual Background

At approximately 5:00 a.m. on October 4, 2000, David Reynolds, Jr. called to check on Pamela Hale who was employed as a clerk at Family Inns East in Pigeon Forge but was unable to get a response. Reynolds, who held a supervisory position with a local hotel chain, which included Family Inns East, had previously spoken with Hale three times on the night of October 3 regarding an auditing problem. Because Hale had been sick the previous evening, Reynolds asked an employee of another hotel to check on Hale. Arriving at Family Inns East, the employee informed Reynolds that a Pigeon Forge police officer was at the motel. Reynolds arrived at the scene around 6:00 a.m. and found Hale lying behind her desk in a pool of blood.

Wayne Knight, an evidence technician with the Pigeon Forge Police Department, arrived at Family Inns East in the early morning hours of October 4, 2000, and found the motel's office in a state of disarray. Coins were lying on the floor, cash drawers and computer monitors were turned over on the check-out counter, and a phone had been knocked off a desk to the right of the check-in counter. The victim was lying face down on the floor behind the desk. In the course of his investigation, Knight determined that some of the cash drawers were missing. Later that afternoon, the missing drawers were discovered on the banks of the Little Pigeon River.

Elizabeth Reid, a forensic scientist with the Tennessee Bureau of Investigation's crime lab, testified that she examined the cash drawers and dusted them for fingerprints. Finding latent prints on the drawers, she compared them with the fingerprints of Brandon Tipton and identified a match. She also received the Appellant's fingerprint card but did not identify her prints on the drawers. Detective Tim Trentham with the Pigeon Forge Police Department testified that on July 13, 2001, Brandon Tipton was interviewed as result of his fingerprints on the cash boxes. Later that day, Brandon Tipton gave a statement to the police implicating himself and the Appellant in the homicide and robbery.[1] The same day Michelle Tipton gave a statement to Special Agent A. R. McCall with the Tennessee Bureau of Investigation and Jake Stinnett of the Pigeon Forge Police Department that she was not with Brandon Tipton on the night of October 3, 2000; however, she confirmed that she did return to their residence around 7:00 a.m. the next morning. Later that evening Barbara Ward, CID Lieutenant with the Pigeon Forge Police, received a phone call from the Appellant stating that she had lied in her earlier statement and that she was in fact at the residence on the night of October 3, 2000.

On July 14, 2001, the Appellant appeared at the Pigeon Forge Police Department to inquire about her husband's status. Detective Trentham advised the Appellant of her Miranda rights, which she signed, and he handed the Appellant her husband's statement. Trentham testified that the Appellant "read the first page of the confession, flipped to the second page and began reading it and

---

[1]On the date of the murder, the Appellant and Brandon Tipton were single and shared a residence in Pigeon Forge. The two were married on October 5, 2000, the day following the murder.

at some point, I don't know how far she read into the second page, she laid it down and said, that's true, that's what happened." Trentham then interviewed the Appellant and prepared a written statement which she read, made changes to, and signed. The Appellant's statement reads:

> After midnight me and Brandon went to Gatlinburg. Brandon was going to burglarize TCYB [sic] on Airport Road. When we got there a police officer was parked nearby and we couldn't do it. Later that night we drove to Pigeon Forge. We saw the lights on in Family Inns East and the clerk inside. I parked near the office and Brandon and I went in and ask [sic] about a room. We got a key from the lady desk clerk and looked at a room. We returned to the office. Brandon walked to the brochure rack to the left of the desk where the clerk was standing. Without warning, Brandon hit the desk clerk in the head with bolt cutters. The clerk grabbed her head and Brandon hit her a couple more times. Brandon grabbed the cash drawers and we ran to my car. We left the motel and drove to our apartment at 522½ Oldham Street. We took the cash boxes inside and Brandon got them open. There was approximately $500 - $600 inside. We loaded the cash boxes back in the car and drove south through Pigeon Forge and onto the Spur. We turned at the first bridge and down north toward Pigeon Forge. I stopped at the first pull off just before Pigeon Forge. Brandon threw the cash boxes in the river. We then drove to Iron Mountain Road and Brandon threw the bolt cutters into the woods.

Based on this information, Trentham located the bolt cutters. He later spoke with the Appellant at the Sevier County Jail where the Appellant drew a diagram of Family Inns East. She also asked whether her fingerprints were obtained from the crime scene and stated that she was careful not to leave any fingerprints at the office pulling her sweater over her hands. She also stated that when pulling out of the parking lot of Family Inns East she had accidently hit Brandon's leg.

Nichole Frierson Nutting testified that while incarcerated at the Sevier County Jail on misdemeanor convictions, she came in contact with the Appellant. The Appellant told Nutting that she and her husband had planned to rob Family Inns East; however, the victim had recognized them as employees of the Log Cabin Pancake House. The Appellant told her that she and Brandon used bolt cutters to kill the victim and that they took cash boxes from the motel, discarded them on the Spur between Pigeon Forge and Gatlinburg, and used part of the money to get married the next day. The State introduced a marriage certificate showing the Appellant and Brandon Tipton were married on October 5, 2000. Yvonne King, manager of the dining room of the Log Cabin Pancake House in Pigeon Forge, testified that the Appellant worked at the restaurant as a waitress from March until May of 2000 and that Brandon Tipton was employed as a busboy until May of 2000.

At trial, the Appellant testified that on the day of the crime, Brandon Tipton gave her Klonopin pills which made her memory "blotchy." After midnight, she and Brandon Tipton drove to Gatlinburg to burglarize TCBY. The Appellant had previously worked at the store and knew that it had a cash box and a small padlock on the door. Their plans were thwarted when they discovered a police officer at the end of the street near TCBY, so they headed back home. En route, Brandon

told the Appellant to pull into Microtel in Pigeon Forge. The couple walked in, asked the price of a room, and walked out. She testified that on the way to Sevierville, Brandon told her to stop at Family Inns East, which was located less than a mile from the couple's home. Brandon asked the clerk if he could see a room, and the clerk handed him a key. They inspected a room and returned to the office where the Appellant suddenly saw Brandon swinging bolt cutters at the victim's head. The Appellant testified that at this point she ran out the front door to her car. As she began to back out, Brandon opened the passenger door and she hit him with the car. When they arrived at the apartment, the Appellant ran upstairs, and Brandon sat in the livingroom opening the cash boxes. He then directed the Appellant to drive back into Pigeon Forge where he threw the cash boxes out the window.

Dr. Cleland Blake, who was the Assistant State Chief Medical Examiner in October of 2000, performed an autopsy on the victim. He stated that the victim had one blunt traumatic injury to the high center of her forehead. Additionally, he testified that the victim had around fourteen blunt trauma injuries to the top of her head which tore the scalp at several points and crushed the skull bone into the brain. Dr. Blake opined that the cause of death resulted from "damage" and "hemorrhage into the brain."

A presentment was returned by a Sevier County grand jury charging the Appellant with first degree premeditated murder and first degree felony murder. The Appellant's trial commenced on July 29, 2003, with the jury returning a guilty verdict for second degree murder and first degree felony murder on July 31. The jury fixed the Appellant's sentence at life imprisonment, and the trial court merged the Appellant's conviction for second degree murder into her conviction for first degree felony murder. A motion for new trial was held on May 10, 2004, which was denied. Notice of appeal was filed May 25, 2004.

**Analysis**

## I. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support her convictions and that the trial court erred in denying her motion for judgment of acquittal. The standard of review for motions on judgment of acquittal is the same as when analyzing the sufficiency of the convicting evidence. *See State v. Blanton*, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). In considering this issue, we apply the rule that where the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after reviewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). These rules are applicable to findings of guilty

predicated upon direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). As in the case of direct evidence, the weight to be given circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958) (citations omitted).

The jury in this case returned verdicts of guilt for both second degree murder and first degree felony murder. The verdict of second degree murder was returned as a lesser included offense of the indicted offense of premeditated first degree murder. The trial court merged the Appellant's conviction for second degree murder with her conviction for first degree felony murder, and the Appellant was sentenced only for the first degree felony murder conviction. We review the sufficiency of the evidence supporting each conviction. The Appellant asserts that she did not have the intent to rob the motel and that her co-defendant's actions were independent of her actions. The Appellant argues that "if [she] has planned a robbery she would not have gone to the hotel room and checked the cleanliness of the bathroom and the firmness of the bed." She also claims that the victim was struck suddenly and that she was surprised by the attack. The State contends that the evidence in this case supports the Appellant's guilt based upon a theory of criminal responsibility for both second degree murder and first degree felony murder.

Our review of the record indicates that although the trial court provided a proper instruction with regard to criminal responsibility, the court failed to instruct the jury on the natural and probable consequences rule on the second degree murder conviction. *See State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000). Typically, review of this issue would be waived as it has not been raised as error at trial or on appeal. *See* Tenn. R. App. P. 13(b). Nevertheless, review of this issue is permitted if plain error exists. Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Because this issue affects a substantial right of the Appellant, we elect plain error review. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000).

The natural and probable consequences rule underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably, and foreseeably put into motion. *Howard*, 30 S.W.3d at 276.

> To impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find the following: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime.

*Id.* In view of the Appellant's statement which was introduced at trial and the nature of the attack upon the victim, we are unable to conclude that the jury's verdict of guilt on second degree murder would have been the same had the appropriate instruction been given. As such, the trial court's error in this regard is not harmless. *Id.* n.6 (citing *Neder v. U.S.*, 527 U.S. 1, 15, 119 S. Ct. 1827, 1837 (1999)). Accordingly, we conclude that omission of the instruction on the natural and probable consequences rule constituted reversible error. The Appellant's conviction for second degree murder is reversed and dismissed.

The natural and probable consequences rule, however, has no application to the Appellant's conviction for felony murder as the felony murder statute "does not require that a homicide committed during the course of one of the enumerated felonies be foreseeable." *State v. Winters*, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003), *perm. to appeal denied*, (Tenn. 2004). Felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2003). "When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000), *perm. to appeal denied*, (Tenn. 2001). The proof at trial, which was established by the statement of the co-defendant, Brandon Tipton, and adopted by the Appellant, revealed that the two discussed robbing the motel as they approached Family Inns East. As her co-defendant repeatedly hit the victim over the head with bolt cutters, the Appellant pulled the phone cord from the desk, and together they left the scene with cash boxes in hand. As such, the Appellant was statutorily responsible for the murder of the victim during the course of the robbery of the motel. Accordingly, the evidence is legally sufficient to support the Appellant's conviction for first degree felony murder.

## II. Disqualification of District Attorney General's Office

The Appellant challenges the trial court's denial of her pretrial motion to disqualify the office of the District Attorney General for the Fourth Judicial District from prosecuting this case. This issue is premised upon the fact that Joanne Ellis was appointed to represent the Appellant in the General Sessions Court of Sevier County on July 16, 2001, and that on March 1, 2002, Ellis began employment as Assistant District Attorney for the Fourth Judicial District. The Appellant filed a motion for disqualification alleging that a conflict of interest existed and that counsel's position with the District Attorney General's office created the appearance of impropriety. An evidentiary hearing was conducted on the motion on February 25, 2002.

Although a hearing was held, the record does not contain a transcript of this hearing; however, the record does contain a motion for disqualification, a stipulation of fact submitted by the State, memoranda for District Attorney General Al Schmutzer concerning Ellis' conflict of interest, and the trial court's order denying the motion. The record reflects that Ellis was appointed to represent the Appellant in the General Sessions Court of Sevier County on July 16, 2001. Ellis participated in the Appellant's preliminary hearing, and, after the Appellant's indictment in the

Circuit Court of Sevier County, she was again appointed as co-counsel. She met with the Appellant and discussed strategy with co-counsel. On March 1, 2002, Ellis began employment as Assistant District Attorney for the Fourth Judicial District.

The stipulation of fact dated February 25, 2002, states that Ellis was disqualified from participation in the prosecution of this case. It confirms:

> [t]hat [Ellis] has not revealed any of the confidences of her client nor discussed the case [with] District Attorney General Al Schmutzer or any member of his staff . . . nor has she been present when the case has been discussed. Further she has not had access to the State's file of Michelle Tipton's case.

A memorandum from District Attorney General Al Schmutzer in anticipation of Ellis' employment lists Ellis' pending Sevier County criminal defense cases, relates that the State's files on these cases "should be kept under lock and key," encourages staff prosecuting those cases to minimize contact with Ellis, and states that Ellis has been assigned to prosecute cases in Cocke County. A separate memorandum directs Assistant District Attorney James Dunn to serve as supervisor and liaison between Ellis and Schmutzer until the disposition of the Appellant's cases at the trial level.

By written order of March 14, 2002, the trial court denied the Appellant's motion to disqualify the entire District Attorney General's office. The Appellant argues that the trial court erred in denying the motion because "[t]o allow the Attorney General . . . to hire away [the Appellant's] attorney created at minimum the appearance of impropriety" regardless of screening procedures. We review a trial court's ruling on the vicarious disqualification of an entire office under an abuse of discretion standard. *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *State v. Culbreath*, 30 S.W.3d 309, 313 (Tenn. 2000). A trial court abuses its discretion when it "appl[ies] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that causes an injustice to the party complaining." *State v. Shirley*, 6. S.W.3d 243, 247 (Tenn. 1999). A prosecutor's disqualification need not be imputed to the "entire district attorney general's office . . . so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution." *State v. Tate*, 925 S.W.2d 548, 556 (Tenn. 1995). We note that this court has previously found it unnecessary to disqualify an entire District Attorney General's office when a defendant's attorney joined the district attorney general's office while the defendant's case was pending. *See State v. Coulter*, 67 S.W.3d 3 (Tenn. Crim. App. 2001); *State v. Steve* Mason, No. 01C01-9603-CC-00103 (Tenn. Crim. App. at Nashville, June 6, 1997).

The State's stipulation establishes that the District Attorney General of the Fourth Judicial District implemented a policy which adequately isolated Ellis from those involved in the Appellant's prosecution and from any information relating to the Appellant's case. Moreover, there is no proof that Ellis disclosed information to the prosecutor or that she participated in any capacity in the Appellant's prosecution. Despite the implementation of an effective screen, the Appellant contends that the District Attorney General's hiring of Ellis creates the appearance of impropriety. Our supreme court has held that an appearance of impropriety may require vicarious disqualification

regardless of adequate screening. *Clinard*, 46 S.W.3d at 186-87. However, this court has concluded that the disqualification doctrine does not apply identically when an attorney transfers to the district attorney general's office as it does when an attorney transfers to a private law firm. *See Coulter*, 67 S.W.3d at 32-33; *Tate*, 925 S.W.2d at 556; *see also State v. Frankie E. Casteel*, No. E2003-01563-CCA-R3-CD (Tenn. Crim. App. at Knoxville, Sept. 24, 2004); *State v. Ricky Raymond Bryan*, No. M1999-00854-CCA-R9-CD (Tenn. Crim. App. at Nashville, Aug. 4, 2000). Where a criminal defense attorney switches adversarial sides, "the appearance of impropriety is not the central concern. Primarily, it is a matter of an unacceptable risk of harm or disclosure which is at issue." *Coulter*, 67 S.W.3d at 33 (*quoting State v. Claybrook No.3*, 1992 WL 17546, at \*8 (Tenn. Crim. App. at Jackson, Feb. 5, 1992)). The District Attorney General's method of screening Ellis rebuts the "central concern." *See Coulter*, 67 S.W.3d at 33. This issue is without merit.

## III. State's Witnesses

The Appellant contends that the testimony of both Yvonne King and Nichole Frierson Nutting should have been excluded. The Appellant argues that Yvonne King's name was not listed on the presentment or provided as part of discovery. At trial, the Appellant's counsel objected to King's testimony on grounds that she learned that King would testify the day before trial was to begin. The Appellant also argues that the only notice she received regarding the State's decision to call Nichole Frierson Nutting as a witness was contained in a letter dated January 22, 2003, which identified Nutting by her maiden name and did not provide an address.

Tennessee Code Annotated section 40-17-106 directs the district attorney general to endorse the name of the witnesses it intends to call upon the bill of indictment or presentment. However, this duty is directory and does not automatically disqualify a witness whose name does not appear on the indictment from testifying. *Harris*, 839 S.W.2d at 69 (Tenn. 1992). The purpose of the statute is to prevent surprise to a defendant and to allow the defendant to prepare a defense. *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996). Moreover, Tenn. R. Crim. P. 16 does not require the State to disclose the name and addresses of its witnesses through pretrial discovery. *Harris*, 839 S.W.2d at 69; *see* Tenn. R. Crim. P. 16. A defendant is entitled to relief for non-disclosure only if he or she can demonstrate prejudice, bad faith, or undue advantage. *Id; Kendricks*, 947 S.W.2d at 883. It is within the discretion of the trial court to allow a witness to testify. *Id.*

Prejudice "[i]n this context is not the prejudice which resulted from the witness[es]' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant." *Id.* (*quoting State v. Jesse Eugene Harris*, No. 88-188-III (Tenn. Crim. App. at Nashville, June 7, 1989)). The Appellant has neither shown what more she would have done had she received notice of King's identity earlier or had knowledge of Nutting's address nor demonstrated the State's bad faith or undue advantage. Therefore, we conclude that the trial court did not abuse its discretion by allowing these witnesses to testify.

## IV. Introduction of Photographs and Portion of Victims's Skull

The Appellant argues that the trial court violated the Tennessee Rules of Evidence by permitting the introduction of various exhibits at trial. Specifically, she argues that the photographs (Exhibits 3, 20, 21, and 22) are more prejudicial than probative. Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies with the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *State v. Faulkner*, 154 S.W.3d 48, 67 (Tenn. 2005) (*quoting Banks*, 564 S.W.2d at 949). However, before a photograph may be entered into evidence, it must be relevant to an issue that the jury must decide, and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. *See State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998), *cert. denied*, 526 U.S. 1071, 119 S. Ct. 1467 (1999); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993), *perm. to appeal denied*, (Tenn. 1993) (citation omitted); *see also* Tenn. R. Evid. 401, 403.

The State asserts that the issue is waived for failure to make a contemporaneous objection at trial pursuant to Tenn. R. App. P. 36(a). The Appellant in this case contends that she "objected to the most horrific evidence but was overruled." However, we note that the Appellant points only to the page in the record where the trial court overruled her objection to the introduction of a portion of the victim's skull (Exhibit 23). Nowhere does the Appellant object to the introduction of photographs at trial. Therefore, we agree with the State that this issue is waived; however, we elect to review the issue on its merits.

The Appellant contests four photographic exhibits on appeal. Exhibit 3, which was introduced during the testimony of Wayne Knight, depicts the crime scene with the phone knocked onto the floor and the chair turned around backwards. It does not show the victim. Exhibits 20, 21, and 22 are autopsy photographs depicting the victim's lacerated and bloody skull. Exhibit 23 is identified as "the top of the victim's skull," which was cleaned of tissue following post-mortem examination. This photo depicts damage to the victim's head. These exhibits were introduced in conjunction with the testimony of Dr. Blake who conducted an autopsy on the victim.

With regard to the crime scene photograph in Exhibit 3, the Appellant does not explain the prejudicial nature of this photograph, and we find none. Regarding Exhibits 20 and 21, Dr. Blake described a "cluster of injuries" from fourteen blows to the head forming a "cookie cutter pattern" in the shape of the weapon used to crush the head. Blake testified that Exhibit 22 would illustrate to the jury the type of weapon causing the injuries due to the hexagonal shape of the injury. Finally, Exhibit 23, a portion of victim's actual skull, illustrates Blake's opinion that bolt cutters caused the injury, as the tool "fits perfectly" within the fracture lines of the skull.

The Appellant in this case was charged with both first degree premeditated murder and first degree felony murder. The challenged exhibits demonstrating repeated blows to the victim's head are relevant to establishing premeditation in this first degree murder case. *See Faulkner*, 154 S.W.3d

at 69. In holding that photographs were admissible, for this reason, our supreme court held, "[t]he primary effect of seeing the photographs is not so much to inflame the viewer as to reveal to the viewer that, whoever inflicted the injuries upon the victim did so deliberately and premeditatively, striking the victim multiple times." *Id.* at 70. Moreover, in this case, we conclude that the exhibits demonstrate that the force of the blows were deadly in nature and not inflicted simply to disable the victim.

We agree with the Appellant that the photographs in this case are unpleasant to view; however, they accurately depict the nature and extent of the victim's injuries and aid the jury in understanding the testimony of the medical examiner. Although the photographs were prejudicial to the Appellant's case, they were highly probative in establishing an element of the crime. We conclude that the trial court did not abuse its discretion in admitting the photographs.

## V. Improper Remarks During Closing Argument

The Appellant asserts that the State committed reversible error in its closing argument based on the following statement: "[b]ack on the night of October 3rd, early morning hours of October 4th of 2000, this defendant along with her husband, now husband, Brandon Tipton, set out to do mischief, set out to prey on the community." The Appellant characterizes this argument as "unduly inflammatory and improper" and specifically claims that the State intended to "put fear into the jury and urge them to save the 'community'" as well as "to promote general deterrence."

The State correctly argues that the Appellant has waived this issue by her failure to lodge a contemporaneous objection at trial. Typically these omissions result in a waiver on appeal of any complaint concerning the prosecutor's comments. Tenn. R. App. P. 36(a); *State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Thus, if this court is to review the Appellant's claim of prosecutorial misconduct, we must do so utilizing plain error review pursuant to Tenn. R. Crim. P. 52(b) which provides: "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." However, in this case, the prosecutor's remarks were neither inflammatory or improper. We conclude that the remarks reflect a proper comment upon the evidence, *i.e.*, after the TCBY burglary was aborted, the two remained undaunted in their criminal efforts and proceeded to enter Family Inns East, where they perpetrated the senseless murder of an innocent victim. Accordingly, further analysis is not necessary as this issue is without merit.

## VI. Co-defendant's Statement

The Appellant contends that she was denied her Sixth Amendment right to confrontation when the trial court allowed the State to introduce her co-defendant's statement at trial. When the Appellant came to the Pigeon Forge Police Department to inquire about her husband's status after he was taken into custody, Detective Trentham advised the Appellant of her Miranda rights and

-10-

handed her the co-defendant's statement. Trentham testified, "[the Appellant] read the first page of the confession, flipped to the second page and began reading it and at some point, I don't know how far she read into the second page, she laid it down and said, that's true, that's what happened." Then Trentham read the first page of the co-defendant's statement to the jury. The second page of the co-defendant's statement was entered into evidence in conjunction with the cross-examination of the Appellant. The statement reads as follows:

> Shortly after midnight on October 4, 2000, my wife Michele [sic] Tipton and I went to Gatlinburg with a plan to burglarize TCBY on Airport Road. I had stolen a pair of bolt cutters from Walmart earlier in the day. The bolt cutters were to be used to cut the lock of the business. When we got there, Michele [sic] was going to drop me off and come back and pick me up. She couldn't because a police office was parked at a BP gas station nearby. We drove around Gatlinburg for a while and then parked to walk around. I walked up to the officer because I knew his kids. We talked for a while. Michele [sic] and I walked back to the car and drove to Pigeon Forge. As we approached Family Inns East I saw the lights on and someone at the desk. We discussed robbing her. We drove in front of the motel office (Family Inn East) toward the river. Michele [sic] parked past a stairwell near the office in the only empty parking spot. We went into the office and asked to look at a room. The desk clerk gave us a key and we went to the room on the top floor of the motel facing the window. I had the bolt cutters in my jacket. We went back to the office. The desk clerk was sitting at a desk to the right of the front door. Michelle layed [sic] the key down and was talking to the desk clerk. I took the bolt cutters and struck her in the head at least 3 times. Once in the back of the head and one in the forehead. I don't know where else in the head I hit her. Michele [sic] jerked the phone cord off the desk. I grabbed the two cash drawers from behind the front counter. They had computer monitors sitting on top of them. The desk clerk had fallen in the floor. We ran with the cash boxes & bolt cutters to the car. I threw the drawers in the trunk of Michelle's gold Saturn. We exited the motel and turned North onto Hwy. 441. Michelle for some reason turned quickly into Food City parking lot and turned around. A female Pigeon Forge officer pulled us over and checked Michelle's drivers license and registration. She let us go. We went straight home. I used some tools to open the boxes they had about $600 in them combined. . . .

After a pretrial motion to suppress and multiple objections by the Appellant at trial, the trial court ruled that the evidence was admissible, concluding that the Appellant "acknowledged [the statement] was true and adopted it as her own statement."

The Appellant, relying on *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), claims that the introduction of her co-defendant's statement violates her Sixth Amendment right to confrontation. The Court in *Crawford* held that "where 'testimonial' [hearsay] evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68, 124 S. Ct. at 1374. *Crawford* included interrogations

by law enforcement officers within this category. *Id.* at 53, 124 S. Ct. at 1365. We recognize that the disputed statement is testimonial as it was made during the course of police interrogation and that the Appellant had no prior opportunity for cross-examination.

The State agues that the trial court properly admitted the co-defendant's statement as it falls within the hearsay exception for adoptive admissions because the Appellant read the statement and acknowledged its truth. *See* Tenn. R. Evid. 803(1.2)(B). Rule 803(1.2)(B) provides a hearsay exception for "a statement in which the party has manifested an adoption or belief in its truth." *Id.* Detective Trentham testified that he handed the co-defendant's statement to the Appellant and that the Appellant read or skimmed the first two pages of the document. The Appellant's response leaves little doubt that the Appellant was attesting to the truth of the statement that implicated her when she told Detective Trentham "that's true, that's what happened." Accordingly, we conclude that the trial court did not abuse its discretion in admitting the statement as the Appellant effectively adopted its content as that of her own. The core issue addressed by the Court in *Crawford* was the introduction of "testimony evidence [which] is at issue" in which a defendant is denied the right of confrontation. Because the unconfronted testimonial evidence presented in this case was not factually disputed, the Appellant's Sixth Amendment right was not implicated.

## VII.  Parole Eligibility

The Appellant contends that the trial court failed to instruct the jury that a defendant cannot be considered for release on a first degree murder conviction until serving at least twenty-five years of the sentence and that the court erred in sentencing the Appellant to "life without parole until 50+ years had been served." The controlling statute with regard to sentencing following a conviction for first degree murder provides:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

Tenn. Code Ann. § 40-35-201(b) (2003) (effective May 18, 1998).

Thus, the Appellant's requested jury instruction is specifically prohibited by statute.[2] Moreover, the Appellant's assertion "that the court erred in sentencing Defendant to life without parole until 50+

---

[2]The statutory provision relied upon by the Appellant was amended on May 1, 1998, to reflect the provisions of Tennessee Code Annotated section 40-35-201(b), as set forth above.

years had been served" is also misplaced.[3]  For crimes committed after July 1, 1995, the term of imprisonment for a first degree murder conviction is one hundred percent (100%) of a life sentence subject to sentence reduction credits up to fifteen percent (15%).  Tenn. Code Ann. § 40-35-501(i)(1), (2) (2003).  Thus, a defendant convicted of first degree murder with the possibility of parole is required to serve a minimum incarceration period of fifty-one years (eighty-five percent (85%) of sixty years).  Because the trial court's instructions comply with the applicable statutory provisions for sentencing in a first degree murder case, the Appellant's argument is without merit.

## CONCLUSION

Based on the foregoing, we reverse the Appellant's conviction for second degree murder; her conviction for first degree felony murder and resulting sentence of life imprisonment are affirmed.

_____
DAVID G. HAYES, JUDGE

---

[3] In pronouncing sentence, the trial court sentenced the Appellant, in accordance with the jury's verdict, to a term of imprisonment for life.  Nowhere does the trial court pronounce the sentence as "life without parole until 50+ years had been served."